## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ARTHUR PERRY BRUDER,

     Plaintiff,

       v.

DR. ERNEST MONIZ, Secretary,
U.S. Department of Energy,

     Defendant.

Civil Action No. 11-1492 (JDB)

### MEMORANDUM OPINION

Plaintiff Arthur Perry Bruder, an attorney representing himself, brought this action against the Secretary of the United States Department of Energy ("DOE"), alleging age and gender discrimination. In an earlier opinion, this Court dismissed all but one count of Bruder's complaint because of his failure to exhaust administrative remedies and to show adverse employment action. See July 17, 2013 Mem. Op. [ECF No. 23]. The only count remaining is Bruder's claim that DOE discriminated against him by giving him a lower annual performance rating—which negatively affected his year-end bonus—than his younger, female co-workers. Now before the Court is [29] DOE's motion for summary judgment on this remaining count, explaining that Bruder's work performance did not merit a higher rating and arguing that Bruder cannot show that this explanation is a pretext for unlawful discrimination. Upon careful consideration of DOE's motion and the parties' memoranda,[1] the applicable law, and the entire record, and for the reasons set forth below, the Court will grant DOE's motion for summary judgment.

---

[1] Def.'s Renewed Mot. for Summ. J. [ECF No. 29] ("Def.'s Mot."); Pl.'s Opp'n to Def.'s Mot. [ECF No. 31] ("Pl.'s Opp'n"); Def.'s Reply to Pl.'s Opp'n [ECF No. 34] ("Def.'s Reply").

## BACKGROUND

Bruder, a male over the age of 64,[2] worked as an attorney for DOE. Def.'s Stmt. of Mat. Facts [ECF No. 29-1] ("Def.'s Stmt.") ¶ 1. His lawsuit stems from his brief tenure in DOE's Administrative Litigation and Information Law group ("ALIL") during the performance evaluation period of October 1, 2006 to September 30, 2007 (the "2006-2007 evaluation period"). Id. ¶¶ 2-7. For the preceding performance evaluation period, Bruder worked as an attorney in DOE's Legal Counsel group, id. ¶ 2, where he received an annual performance rating of 3.6 on an ascending scale of 1.0 to 4.0, see Attach. A to Ex. N to Def.'s Mot. [ECF No. 29-3], Bruder's 2005-2006 Annual Performance Eval. at 10. A rating between a 2.8 and a 3.4 is considered "highly successful" and a rating of a 3.5 or above is considered "outstanding." Ex. B to Def.'s Mot. to Dismiss or for Summ. J. [ECF No. 13-2], Decl. of Kathleen J. Benner ("Benner Decl.") ¶ 12.

In late 2006, DOE reorganized its legal office, and Bruder was assigned to ALIL. Def.'s Stmt. ¶¶ 3-4, 7. Bruder's immediate supervisor in ALIL was Isiah Smith, and Bruder's second-level supervisor was Susan Beard. Id. ¶ 7. In addition to Bruder, there were four other employees in ALIL—Nisha Kumar, Reesha Trznadel, Jocelyn Richards, and Katie Strangis—all of whom were female and younger than Bruder. See Compl. [ECF No. 1] at 3.

In both March 2007 and June 2007, Bruder received interim performance ratings of 3.0 for his work in ALIL.[3] Ex. P to Def.'s Mot. to Dismiss or for Summ. J. [ECF No. 13-3], Decl. of Isiah Smith ("Smith Decl.") ¶¶ 4-5. Smith, the supervisor who issued Bruder's interim ratings,

---

[2] See Attach. to Compl. [ECF No. 1] at 8, DOE Notice of Final Order ("Notice of Final Order").

[3] The interim ratings are not at issue here. The Court dismissed any claim relating to them in its previous opinion because, unlike his final annual rating, the interim ratings did not affect Bruder's employment or compensation. See July 17, 2013 Mem. Op. at 11-12. Nonetheless, Bruder again contests them in his most recent filing. See Pl.'s Opp'n at 83-84. Although his interim ratings may be indicative of his performance over the course of the year, there is no indication that they were part of the computation of his final annual rating. Hence, the Court will not revisit this claim.

explained that Bruder's "performance was inconsistent" and that he "often did not complete his assignments and [that] he did not complete them in a fashion that would have warranted higher ratings." Id. ¶¶ 4-5, 13.

During a June 26, 2007 meeting between Bruder and Smith regarding Bruder's June 2007 interim rating, Bruder objected to the 3.0 rating and refused to sign the rating form. Def.'s Stmt. ¶ 31. In the meeting, Bruder requested a permanent transfer to a different office. Id. ¶ 32. Smith later relayed this request to Beard. Id. Shortly thereafter, on July 11, 2007, Smith went on emergency medical leave. Id. That same day, Bruder spoke with Beard about being transferred to another office. Id. ¶ 34. Beard advised Bruder that she did not have the authority to act on his request, but that she would pass it along to her supervisors. Id. ¶ 35.

In the meantime, Beard appointed Kumar and Trznadel to fill in for Smith as ALIL supervisors on a rotating basis until Smith returned to work. Id. ¶ 33. Soon afterward, Beard learned from Kumar and Trznadel that Bruder had refused to take any new assignments from them, purportedly because he was too busy and because he was leaving for vacation. Id. ¶¶ 36-37. Beard avers that "it is never a valid excuse to refuse assignments because of vacation plans" and "it is very doubtful that Mr. Bruder was too busy with other work . . . to accept new assignments." Ex. J to Def.'s Mot. [ECF No. 29-2], Sept. 9, 2013 Decl. of Susan Beard[4] ("3d Beard Decl.") ¶ 7.

Bruder went on his vacation from Tuesday, July 17, 2007, through Friday, July 20, 2007. Pl.'s Stmt. of Mat. Facts [ECF No. 31-3] ("Pl.'s Stmt.") at 4. Before he left, Beard states that Bruder gave her a list of his pending assignments, and she "was able to close four of [his FOIA]

---

[4] There are two so-called "Second Declarations of Susan Beard." The Court will refer to the March 5, 2010 declaration as the "2d Beard Decl.," see Attach. B to Ex. J to Def.'s Mot. [ECF No. 29-2], and to the September 9, 2013 declaration as the "3d Beard Decl.," see Ex. J to Def.'s Mot. [ECF No. 29-2]. The "1st Beard Decl." is dated October 22, 2009. See Ex. V to Def.'s Mot. to Dismiss or for Summ. J. [ECF No. 16-1].

cases" in "short order simply by making a few phone calls to offices within DOE." Def.'s Stmt. ¶¶ 14-15. Beard also states that she reviewed another FOIA matter assigned to Bruder and found that he had "missed the main legal issue." Id. ¶ 15.

Beard met with her supervisors on Monday, July 16, 2007, to pass along Bruder's request for a permanent transfer. Id. ¶ 38. The supervisors decided that Bruder could not be permanently transferred, but that he could be placed on detail to another office after he returned from his vacation on Monday, July 23, 2007. Id. ¶¶ 38-39. Beard did not tell anyone in the office about Bruder's upcoming detail and did not communicate the news to Bruder until he returned to the office from his vacation. Id. ¶ 39. The detail became effective on Tuesday, July 24, 2007, retroactive to Monday, July 23, 2007. Id. ¶ 40. For the approximately ten weeks remaining in the 2006-2007 evaluation period, which ended on September 30, 2007, Bruder was on detail and under the immediate supervision of Lot Cooke. Id. ¶ 41. Cooke provided Beard with a positive evaluation of Bruder's work for that time period. Id. ¶ 44.

For the 2006-2007 evaluation period, Bruder received an annual performance rating of 3.2. Id. ¶ 45. A rating of a 3.2 is in the "highly successful" band of possible ratings (2.8-3.4), rather than the "outstanding" band of possible ratings (3.5 and above). See Benner Decl. ¶ 12. Initially, Smith recommended to Beard (who was responsible for making the final decision on the year-end ratings for ALIL employees) that Bruder receive a 3.0. Def.'s Stmt. ¶ 42. Beard stated that she decided to raise that recommended rating to a 3.2 because of Cooke's positive assessment of Bruder's work on detail during the last ten weeks of the evaluation period. Id. ¶¶ 43-44. Bruder later received a $2,592 year-end bonus, based in part on his annual performance rating. Id. ¶ 49. He asserts that he "received a lower rating and, as a result, a lower monetary bonus, than his work merited." Compl. at 7.

The ratings for all ALIL employees were numeric only; they did not contain written comments about the employees' performance. <u>See</u> Attachs. A-E to Ex M. to Def.'s Mot., ALIL Employees' 2006-2007 Annual Performance Evals. Below is a chart of the annual ratings and bonus amounts for Bruder and his co-workers in ALIL:

| <u>Name</u> | <u>Annual Rating</u> | <u>Bonus Amount</u> |
|---|---|---|
| Bruder | 3.2 | $2,592 |
| Kumar | 4.0 | $1,944 |
| Richardson | 4.0 | $2,675 |
| Strangis | 3.8 | $2,786 |
| Trznadel | 4.0 | $2,759 |

<u>See</u> <u>id.</u>; Attach. 3 to Pl.'s Opp'n to Def.'s Mot. to Dismiss [ECF 14-1], Def.'s Resp. to Req. for Docs., No. 8. Bruder alleges that Kumar, who received a final rating of a 4.0 and a $1,944 bonus, only worked half time, and that Trznadel, who received a final rating of a 4.0, received a $2,759 salary increase, rather than a bonus. Pl.'s Opp'n to Def.'s Mot. to Dismiss [ECF No. 14] at 8. The other two attorneys received final ratings of a 4.0 and a 3.8 and bonuses of $2,675 and $2,786, respectively.

Shortly after he received his year-end rating, Bruder initiated a formal complaint with the DOE's Office of Civil Rights ("OCR"), alleging that he had received "unfair and biased ratings" and "every one of the younger females" received better ratings. Ex. C to Def.'s Mot. to Dismiss or for Summ. J. [ECF No. 13-3], Pl.'s Admin. Compl. ("Pl.'s Admin. Compl.") at 3. Bruder initially claimed that he was discriminated against on the basis of age, race, gender, and religion, <u>see</u> <u>id.</u> at 1; however, he subsequently abandoned his claims for race and religious discrimination. He stated in his administrative complaint that he believes Smith "gave [Bruder] unfair and biased ratings" and gave "much better ratings to each and every one of the younger females whom he supervised." <u>Id.</u> at 3. Bruder also asserts that Smith "was provided with a great many valuable and unearned advantages by educators and mentors who wanted to put him

forward because of his racial background"[5] and that Smith "operate[s] in his professional capacity with an acute awareness that he did not earn upon his own merit, and is thus not worthy of, the advanced degrees which he holds." Id. at 2. Bruder concludes that these factors "render Mr. Smith especially abusive in his supervision of older men." Id. OCR accepted Bruder's claim (as well as several others now not at issue before the Court) for investigation. See Notice of Final Order. Bruder's initial administrative complaint did not allege that Beard participated in any of the alleged discrimination. See Pl.'s Admin. Compl. In late 2007, however, Bruder amended his complaint to add Beard as a discriminating actor. Ex. F to Def.'s Mot. to Dismiss or for Summ. J. [ECF No. 13-3], Pl.'s Amends. to Admin. Compl. at 1.

As part of the subsequent EEO investigation, Smith submitted a witness affidavit explaining why he believed Bruder's work performance merited a "highly successful" rating rather than an "outstanding" rating. See Smith Witness Aff. at 2-5. Smith stated that "there were work assignments that [Bruder] either did not finish or did not complete in a fashion meriting an outstanding rating," and then cited several specific examples. Id. at 2. Smith also indicated that "[t]here were a couple of officials outside of the Office of General Counsel who actually asked that [Bruder] not be assigned to do their work for their offices." Id. at 3. He also noted that Bruder "kept his door closed" while at work, and when one entered Bruder's office, "often the only thing visible on his desk was a novel." Id. at 2. And Smith stated that Bruder refused to accept cases from the acting supervisors when Smith was on sick leave, did not appear to be actively working on cases, and did "not take responsibility for doing [] work or acknowledging or correcting errors." Id. at 4-5.

---

[5] Smith is African-American. See Ex. I to Def.'s Mot. [ECF No. 29-2], Witness Aff. of Isiah Smith ("Smith Witness Aff.") at 1.

Beard also submitted a witness affidavit for the EEO investigation. She explained that she discussed Bruder's annual performance rating with Smith prior to its issuance and, "[b]ased on [her] knowledge of Mr. Bruder's work," she agreed with Smith's assessment. Ex. A to Def.'s Mot. [ECF No. 29-2], Witness Aff. of Susan Beard ("Beard Witness Aff.") at 4.

In the meantime, Bruder's detail assignment continued into the 2007-2008 evaluation period (October 1, 2007-September 30, 2008). Def.'s Stmt. ¶ 54. Because Bruder had not been permanently reassigned, Beard remained responsible for issuing his annual rating. Id. For that evaluation period, DOE adopted a new appraisal system based on a scale of 1 to 100. Id. ¶ 55. Bruder received an 80.50, which is "often described as being 'Outstanding.'" Id. ¶ 56. Beard stated that she issued this rating based on the input she received from the supervisors for whom Bruder worked while on detail. Id. ¶ 54. Bruder never returned to ALIL after he left for his detail assignment. Id. ¶ 50. He was permanently reassigned to another group in November 2008. Id. ¶ 53. In 2013, he retired from federal service. Id. ¶ 56.

On May 20, 2011, after an investigation and a hearing, an administrative judge assigned by the EEOC dismissed Bruder's claims of discrimination, finding that there were no genuine issues of material fact. See Notice of Final Order. About two months later, Bruder filed a complaint in this Court. See Compl. at 1. The Court has since dismissed all but one count of his complaint because of his failure to exhaust administrative remedies and to show adverse employment action. See July 17, 2013 Mem. Op. Bruder's only remaining claim alleges that he suffered age and gender discrimination when he received a lower 2006-2007 annual performance rating than his younger, female co-workers. DOE now moves for summary judgment, arguing that Bruder cannot show that DOE's explanation that his work did not merit a higher performance rating is a pretext for discrimination.

# **LEGAL STANDARD**

## A. SUMMARY JUDGMENT

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it could affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The moving party may successfully support its motion by identifying those portions of "the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of motion only), admissions, interrogatory answers, or other materials," which it believes demonstrate the absence of a genuine issue of material fact. Fed. R. Civ. P. 56(c)(1); see also Celotex, 477 U.S. at 323.

In determining whether there exists a genuine dispute of material fact sufficient to preclude summary judgment, the Court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor. See Anderson, 477 U.S. at 255. The non-moving party must, however, establish more than the "mere existence of a scintilla of evidence" in support of its position, id. at 252, and may not rely solely on allegations or conclusory statements, Greene v. Dalton, 164 F.3d 671, 675 (D.C. Cir. 1999). Moreover, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (internal citations omitted). Summary judgment, then,

is appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]." Id. at 252.

## B. TITLE VII AND ADEA

Title VII prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2. ADEA prohibits discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Both Title VII and ADEA claims are analyzed in the same way. Barnett v. PA Consulting Grp., Inc., 715 F.3d 354, 358 (D.C. Cir. 2013). To prove unlawful discrimination, a plaintiff must demonstrate by a preponderance of the evidence that the actions taken by the employer were "more likely than not based on the consideration of impermissible factors" such as gender or age. Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981) (internal quotation marks and citation omitted). A plaintiff may prove his claim with direct evidence or, absent direct evidence, he may indirectly prove discrimination under the burden-shifting framework created by McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See, e.g., Pollard v. Quest Diagnostics, 610 F. Supp. 2d 1, 18 (D.D.C. 2009). Under that framework, the plaintiff carries the initial burden of establishing a prima facie case by a preponderance of the evidence. McDonnell Douglas, 411 U.S. at 802.

When "an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision," however, "the district court need not—and should not—decide whether plaintiff actually made out a prima facie case under McDonnell Douglas." Brady v. Office of the Sgt. at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008).

Instead, the court must determine only whether the plaintiff has produced "sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee[.]" Id.; accord Vatel v. Alliance of Auto. Mfrs., 627 F.3d 1245, 1246-47 (D.C. Cir. 2011); see also Baloch v. Kempthorne, 550 F.3d 1191, 1196 (D.C. Cir. 2008) (applying the Brady analysis to ADEA claims). The plaintiff has the ultimate burden of establishing that the reason provided by the employer is pretextual. See Morgan v. Fed. Home Loan Mortg. Corp., 328 F.3d 647, 654 (D.C. Cir. 2003).

"A plaintiff in a Title VII case retains the burden of supporting allegations of . . . pretext with affidavits or other competent evidence showing that there is a genuine issue for trial." Hastie v. Henderson, 121 F. Supp. 2d 72, 77 (D.D.C. 2000) (internal quotation marks and citation omitted). "[A] plaintiff cannot create a factual issue of pretext with mere allegations or personal speculation." Id. (internal quotation marks and citation omitted). Moreover, "[e]vidence of discrimination or pretext that is 'merely colorable' or 'not significantly probative' cannot prevent the issuance of summary judgment." Johnson v. Digital Equip. Corp., 836 F. Supp. 14, 15 (D.D.C. 1993) (citing Anderson, 477 U.S. at 249-50).

## DISCUSSION

Bruder claims that DOE discriminated against him by giving him a lower 2006-2007 annual performance rating than his younger, female co-workers. In response, DOE explains that Bruder's work performance did not warrant a higher rating. Because Bruder's annual performance rating is an adverse employment action[6] and because DOE has proffered a non-

---

[6] The Court previously held that Bruder's 2006-2007 performance rating qualified as an adverse action because it was directly tied to the amount of his annual performance bonus. See July 17, 2013 Mem. Op. at 12-13 (citing Russell v. Principi, 257 F.3d 815, 818-19 (D.C. Cir. 2001) (where an employee's performance rating was directly tied to a bonus amount, the rating could constitute an adverse employment action)).

discriminatory explanation for taking that action, it is now Bruder's burden to establish that the non-discriminatory explanation provided by DOE is pretextual. Morgan, 328 F.3d at 654. Bruder fails, however, to submit evidence from which a reasonable jury could infer that DOE's explanation is pretext for intentional discrimination, and therefore the Court will grant summary judgment in favor of DOE.

## I.    DOE PROVIDES A LEGITIMATE NON-DISCRIMINATORY EXPLANATION.

The simple fact that Bruder received a lower annual performance rating than his younger, female co-workers does not automatically give rise to an inference of discrimination. Instead, it is the "motivation behind" the action that "determines whether the [employer's] action violates" federal anti-discrimination law. Mulrain v. Donovan, 900 F. Supp. 2d 62, 67 (D.D.C. 2012).

Here, DOE asserts that Smith and Beard were responsible for Bruder's annual rating and that they based their decision on Bruder's work performance over the course of the 2006-2007 evaluation period. Smith made the initial recommendation for Bruder's annual rating and Beard made the final decision. DOE claims that Bruder received a 3.2 because his work performance did not deserve a higher rating. DOE's burden is simply "one of production, not persuasion." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000). "It need only articulate a legitimate nondiscriminatory reason for its [] decision and offer admissible evidence in support of that reason." Peterson v. Archstone, 925 F. Supp. 2d 78, 86 (D.D.C. 2013) (citing Reeves, 530 U.S. at 142). DOE has done so here.

There is no dispute that Smith warned Bruder in two prior, interim ratings that his work needed improvement because his "performance was inconsistent" and he "often did not complete his assignments and he did not complete them in a fashion that would have warranted higher ratings." Smith Decl. ¶¶ 4-5, 13. With respect to Bruder's final rating, DOE has produced

testimony from Smith stating that Bruder "did not show any improvement from the interim ratings," id. ¶ 13, and that "there were work assignments that [Bruder] either did not finish or did not complete in a fashion meriting an outstanding rating," Smith Witness Aff. at 2. Smith also provides several specific examples of Bruder's less-than-outstanding work performance: Bruder complained that a particular assignment was beneath him; failed to timely complete a lost property policy assignment; refused to reject an improperly filed claim; and failed to timely complete a drug policy assignment. Smith Witness Aff. at 2; see also Smith Decl. ¶¶ 5, 13-16.

DOE also contends that Bruder "was very difficult to supervise and appeared to go out of his way to generate conflict with Mr. Smith, his direct supervisor, and any[]one else who tried to supervise him." Def.'s Mot. at 14. DOE provides supporting statements from Smith regarding situations when Bruder refused to accept assignments or refused to obey instructions about how a case should be handled, as well as statements from Kumar and Trznadel regarding how Bruder refused to accept assignments from them while they were his acting supervisors. See Smith Witness Aff. ¶¶ 2-3, 5; Smith Decl. ¶¶ 13-16; Ex. H to Def.'s Mot. [ECF No. 29-2], Aug. 21, 2013 Decl. of Reesha Trznadel ("2d Trznadel Decl.") ¶ 6; Attach. A to Ex. H. to Def.'s Mot. [ECF No. 29-2], July 29, 2009 Decl. of Reesha Trznadel ("1st Trznadel Decl.") ¶ 5; Ex. Q to Def.'s Mot. to Dismiss or for Summ. J. [ECF No. 13-4], July 30, 2009 Decl. of Nisha Kumar ("Kumar Decl.") ¶ 6).

DOE also provides testimony from Beard, Bruder's second-level supervisor, who was responsible for the final decision on Bruder's annual rating. She found Bruder's work to be less than outstanding, and raised Bruder's rating from the 3.0 suggested by Smith to a 3.2 only because of Bruder's positive evaluation while on detail. 3d Beard Decl. ¶ 9; Attach. B to Ex. J to Def.'s Mot. [ECF No. 29-2], Mar. 5, 2010 Decl. of Susan Beard ("2d Beard Decl.") ¶ 13. Beard

received information from Smith about Bruder's work performance, <u>see</u> Beard Witness Aff. at 3-4, but she also had her own direct experience with Bruder's work. For example, she stated that Bruder gave her a list of cases he was purportedly working on, and she was able to close four of them in "short order." Ex. V to Def.'s Mot. to Dismiss or for Summ. J [ECF No. 16-1], Oct. 22, 2009 Decl. of Susan Beard ("1st Beard Decl.") at 20. And, upon review of another case, Beard found Bruder had "missed the main legal issue." <u>Id.</u> Beard was also aware that Bruder had refused to take new assignments from Kumar and Trznadel while they were his acting supervisors. <u>Id.</u>; <u>see also</u> 3d Beard Decl. ¶ 6. Based on this information, Beard concluded that the 3.2 rating, "which was equivalent to a highly successful performance that entitled [Bruder] to a performance award," was fair. 1st Beard Decl. at 20.

DOE also provided testimony demonstrating that, over the course of the 2006-2007 evaluation period, Bruder's ALIL co-workers observed Bruder's work performance to be less than outstanding. DOE asserts that this testimony generally shows that Bruder "displayed an indifference to his assigned responsibilities from the beginning of the period in which he was assigned to the ALIL group." Def.'s Mot. at 15 (citing Ex. K to Def.'s Mot. [ECF No. 29-2], Aug. 20, 2013 Decl. of Jocelyn Richards ("2d Richards Decl.") ¶ 4; Ex. G to Def.'s Mot. [ECF No. 29-2], Aug. 6, 2013 Decl. of Katie Strangis ("2d Strangis Decl.") ¶ 3; 2d Trznadel Decl. ¶¶ 4-5)). These former co-workers observed that Bruder's computer was rarely on and that there were no "indicia in his immediate work area (e.g., papers, file folders, books, pens) that would have demonstrated that he was actually performing work, on a consistent basis[.]" Def.'s Mot. at 14 (citing 2d Richards Decl. ¶¶ 3-4; 2d Strangis Decl. ¶¶ 3-4; 2d Trznadel Decl. ¶ 5). Bruder's co-workers also observed him reading a "popular novel at his desk during normal work hours." <u>Id.</u> (citing 2d Richards Decl. ¶ 4; 2d Strangis Decl. ¶ 4). And, as already mentioned, Kumar and

Trznadel claim that, when they served as acting supervisors, Bruder refused to accept new assignments from them.  2d Trznadel Decl. ¶ 6; 1st Trznadel Decl. ¶ 5; Kumar Decl. ¶ 6.

DOE's dissatisfaction with Bruder's work performance—supported by testimony from Bruder's former supervisors and all of Bruder's former ALIL co-workers—is a legitimate, non-discriminatory reason for Bruder's annual performance rating.  See Dews-Miller v. Clinton, 707 F. Supp. 2d 28, 52 (D.D.C. 2010) (explaining that supervisors' dissatisfaction with employee's work was a legitimate, non-discriminatory reason for employee's two "minimally successful" performance evaluations); see also Paquin v. Fed. Nat'l. Mortg. Ass'n, 119 F.3d 23, 27 (D.C. Cir. 1997) (holding that employer's dissatisfaction with employee's work was a legitimate non-discriminatory reason for employee's termination).  Accordingly, the burden shifts to Bruder and the question becomes whether his evidence creates a material dispute on the ultimate issue of discrimination.  See McGrath v. Clinton, 666 F.3d 1377, 1380 n.3 (D.C. Cir. 2012).

## II.     BRUDER FAILS TO SHOW PRETEXT.

The Court now considers whether, in light of the total circumstances of the case, Bruder has shown that DOE's explanation is mere pretext by "produc[ing] evidence sufficient for a reasonable jury to find that the employer's stated reason was not the actual reason and that the employer intentionally discriminated" against Bruder on the basis of his age or gender.  Brady, 520 F.3d at 495.  A plaintiff may establish pretext "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  Burdine, 450 U.S. at 256.  Mere allegations of pretext are not sufficient; the employee must offer evidence showing that the employer's explanation is "false, that it is a lie, or that the employer's real motivation was discriminatory."  Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1289 n.3 (D.C. Cir. 1998) (en

banc). "The more valid a reason appears upon evaluation, the less likely a court will be to find that reason pretextual." Ryan v. Reno, 168 F.3d 520, 524 (D.C. Cir. 1999) (internal quotation marks and citation omitted).

Considering the record in its entirety, the Court finds that no reasonable jury could conclude that DOE's explanation for Bruder's annual rating is pretext for unlawful discrimination. DOE has shown through witness testimony—not just from Bruder's supervisors, but also from his former ALIL co-workers—that Bruder's work performance was less than outstanding. And Bruder does not discredit that testimony, nor does he provide other evidence sufficient to show that discrimination was the true motivation behind his annual rating.

### A. **Bruder Does Not Discredit The Testimony Of His Former Supervisors and Co-Workers Regarding His Less-Than-Outstanding Work Performance.**

Federal anti-discrimination law "does not authorize a federal court to become a super-personnel department that re-examines an entity's business decisions." Barbour v. Browner, 181 F.3d 1342, 1346 (D.C. Cir. 1999) (internal quotation marks and citation omitted). That said, "[e]vidence indicating that an employer misjudged an employee's . . . performance or qualifications" can be "relevant to the question whether its stated reason is a pretext." Grosdidier v. Broad. Bd. of Governors, Chairman, 709 F.3d 19, 26 (D.C. Cir. 2013) (quoting Fischbach v. D.C. Dep't of Corrections, 86 F.3d 1180, 1183 (D.C. Cir. 1996)). For example, "if the employer made an error too obvious to be unintentional, perhaps it had an unlawful motive for doing so." Fischbach, 86 F.3d at 1183. But "it will not do for the plaintiff to show that the employer's stated reason was false if the employer believed it in good faith; the plaintiff must establish a basis to conclude that the employer has lied about the reason or, more directly, that the reason was discriminatory." Desmond v. Mukasey, 530 F.3d 944, 963-64 (D.C. Cir. 2008) (citing Brady, 520 F.3d at 495). Speculation or conclusory allegations are not sufficient; the plaintiff must

provide evidence to demonstrate that the employer's performance-based explanation is a lie. See, e.g., Manuel v. Potter, 685 F. Supp. 2d 46, 63 (D.D.C. 2010) (granting summary judgment to defendant because plaintiff failed to provide any evidence undermining his supervisors' claim that they "honestly believed" plaintiff's work "was deficient" when they issued him a negative performance review). And a plaintiff's subjective assessment of his own performance is not sufficient evidence of pretext. See Dorns v. Geithner, 692 F. Supp. 2d 119, 135 (D.D.C. 2010) (granting the defendant summary judgment because "the plaintiff ha[d] produced no evidence beyond her own subjective opinion that she performed at a higher level" than her performance reviews reflected). Accordingly, the Court's function at this stage is to determine, based on the record, "whether [the employer] honestly believed" that the plaintiff's work product and performance deserved the given ratings and "acted in good faith upon those beliefs." Kelly v. Mills, 677 F. Supp. 2d 206, 228-29 (D.D.C. 2010); see also Fischbach, 86 F.3d at 1183 (explaining that, in determining whether plaintiff has put forth sufficient evidence to infer pretext, the critical issue is not whether the employer's reasons were true or false, but whether it honestly believed the reasons when taking the personnel action).

Here, DOE has introduced testimony from Bruder's two supervisors and all of his former ALIL co-workers that paints a vivid picture of Bruder's less-than-outstanding work performance in ALIL. In response, Bruder baldly asserts that all of his former supervisors and co-workers are lying about the performance issues to which they attest. His arguments fail because he does not produce any evidence demonstrating that DOE did not honestly believe that he deserved the given rating based on his work performance.

1.   <u>Bruder fails to discredit his former supervisors' testimony</u>.

Bruder has not provided competent evidence to suggest that Smith and Beard—who were both involved in deciding his final rating—did not honestly believe that Bruder's work performance warranted the 3.2 rating.

### a.   *Smith's belief that Bruder's work performance deserved the given rating*

As discussed above, Smith provided several reasons why Bruder's work performance in the 2006-2007 evaluation period did not merit a higher rating.  For example, Smith states that Bruder complained that an assignment to process a claim was beneath him; challenged Smith and anyone else who tried to supervise him; failed to timely complete a lost property policy assignment; refused to reject a claim that Smith told him was not properly filed against DOE; and failed to timely complete a drug policy assignment.  <u>See</u> Smith Decl. ¶¶ 5, 13-16; Smith Witness Aff. at 2.

Bruder does not address Smith's assertion that Bruder complained that an assignment to process a claim was beneath him, nor does he address Smith's assertion that Bruder "struck a posture from almost the very beginning of his work in my shop of challenging me or anyone else who tried to supervise him."  Smith Decl. ¶ 16.  In fact, Bruder admits that he was not pleased with his work assignments, <u>see</u> Pl.'s Opp'n at 11-12; Compl. at 4, and that he refused to accept new assignments on at least one occasion, <u>see</u> Pl.'s Opp'n at 62.  Nonetheless, Bruder maintains generally that Smith's statements about his work performance are lies, citing to a few alleged examples.  These examples, however, are supported only by Bruder's own speculation and conclusory allegations.

For instance, Bruder asserts that Smith was untruthful when he stated that Bruder failed to complete an assignment that involved writing a policy "on holding employees responsible for

[lost] property." Pl.'s Opp'n at 33. Smith's specific statement on the matter was that Bruder "failed to complete in a timely fashion" an "assignment involving drafting a policy to cover employees who had lost government property." Smith Decl. ¶ 5; see also Smith Witness Aff. at 2. In response, Bruder claims that Smith is lying, as shown by the lack of "credible evidence that Isiah Smith ever gave [Bruder] any such assignment [or that Bruder] failed to do the assignment or did it unsatisfactorily." Pl.'s Opp'n at 38. But Bruder's only purported evidence that Smith's statement is untruthful is Bruder's own statement that "[n]either GC-77's[7] list of assignments nor lists which [Bruder] kept show that any such assignment was made to him." Id. at 33-34. And Bruder fails to produce these alleged lists or to provide a sworn statement in support of this purported evidence. DOE, on the other hand, has produced sworn testimony from Smith about the matter. See Smith Decl. ¶ 5; Smith Witness Aff. at 2. At this stage, Bruder has an obligation to support his allegations with competent evidence. See, e.g., Brown v. Mills, 674 F. Supp. 2d 182, 188 (D.D.C. 2009). But he has submitted nothing other than his own speculation and conclusory allegations, which are insufficient to show pretext. See Hastie, 121 F. Supp. 2d at 77 ("[A] plaintiff cannot create a factual issue of pretext with mere allegations or personal speculation.") (internal quotation marks and citation omitted); see also Slovinec v. Am. Univ., 520 F. Supp. 2d 107, 120 (D.D.C. 2007) (rejecting "[p]laintiff's conclusory, self-serving statements pertaining to [d]efendant's 'phony' explanation").

Similarly lacking in support is Bruder's claim that "Isiah Smith falsely asserted that [Bruder]'s improper work caused Isiah Smith to have to write a letter to the claimant's attorney . . . rejecting [an FTCA] claim." Pl.'s Opp'n at 25 (internal quotation marks omitted). Smith's specific statement on the matter was that "[t]here was . . . a tort claim . . . which Mr. Bruder

---

[7] "GC-77" is DOE's General Law Section, of which ALIL is a part. See Def.'s Stmt. of Mat. Facts to Def.'s Mot. to Dismiss or for Summ. J. [ECF No. 13-1] ¶ 48.

maintained was properly filed . . . even though I informed him that [it was not] . . . . [So] I had to write a letter to the claimant's attorney rejecting the aforementioned tort claim." Smith Witness Aff. at 2. Bruder's purported evidence that Smith lied is that Smith has been unable to find the letter he says he wrote to the claimant to reject the claim. Pl.'s Opp'n at 25 (citing Attach. F to Pl.'s Opp'n [ECF No. 31-2], Deposition of Isiah Smith ("Smith Dep.") at 208:12-13). Bruder argues that Smith should "simply ask the supposed recipient of that supposed letter to provide a copy," and that Smith's failure to do so "[makes it] obvious that Isiah Smith fabricated this assertion about having had to write this letter in an more [sic] effort to create and compound 'non-discriminatory' explanations for the [supervisors'] unlawful discriminatory behavior." Id. at 26. But Bruder's mere speculation about the meaning behind Smith's inability to find the letter is not sufficient evidence to show pretext. See Hastie, 121 F. Supp. 2d at 77. The fact that Smith did not produce documentation of a letter that he says he sent several years ago does not, by itself, cast doubt on his statement that he had to close the case because Bruder refused to obey his instructions. And Bruder does not deny that he refused to obey Smith's instructions to close the case. Bruder's bare assertion that "Isiah Smith's claim to have written and sent this letter is definitely or very likely untrue, pretextual, and certainly constitutes an issue of material fact," Pl.'s Opp'n at 26, is not sufficient to show pretext or to create a genuine dispute of material fact. See Pollard, 610 F. Supp. 2d at 33 (a plaintiff's "'unsupported, personal speculation about the motivations'" of her employer is not enough to show pretext) (quoting Asghar v. Paulson, 580 F. Supp. 2d 30, 37 n.15 (D.D.C. 2008)).

Bruder also asserts that Smith was untruthful when he stated that Bruder did not successfully complete a drug policy assignment. Pl.'s Opp'n at 38-45; see also Smith Decl. ¶ 5; Smith Witness Aff. at 2. Bruder's purported evidence is a memorandum that he sent to Smith

analyzing a proposed drug policy order.  <u>See</u> Attach. 10 to Pl.'s Opp'n to Def.'s Mot. to Dismiss or for Summ. J. [ECF No. 14-1].  Smith clarifies in his deposition testimony, however, that this memorandum is not the work product that he had requested; rather, he had requested a new draft order.  <u>See</u> Smith Dep. at 97:4-6.  Bruder does not provide evidence to contradict Smith's statement.  Furthermore, as Bruder points out, Smith later reassigned the drug policy assignment to Trznadel, which supports Smith's statement that Bruder did not successfully complete the assignment.  <u>See</u> Pl.'s Opp'n at 40-42.  In short, nothing Bruder offers on this point reveals untruthfulness in Smith's statement.

Bruder also manufactures inconsistencies in Smith's testimony where none exist.  For example, Bruder argues that Smith's testimony was inconsistent when he said Bruder acted "unethically" in a particular situation, and later "tried to back-peddle [sic] from this accusation." Pl.'s Opp'n at 31-32 (citing Smith Dep. at 154-156).  Smith, however, never asserted that Bruder acted unethically, <u>see</u> Smith Dep. at 155:11-18, and he made perfectly clear in his deposition that he did not think Bruder's work was unethical, but rather "inaccurate," <u>see</u> <u>id.</u> 155:19-21, 156:12-13, a description from which he does not backpedal.  Bruder's bare allegation of an inconsistency where there is none cannot create a genuine issue of material fact.

Despite the many pages devoted to arguing that Smith's sworn statements are untruthful, Bruder fails to produce any evidence showing that Smith "made an error [in assessing Bruder's work] too obvious to be unintentional," <u>Fischbach</u>, 86 F.3d at 1183, or that Smith did not "honestly believe" that Bruder deserved the rating he received, <u>Kelly</u>, 677 F. Supp. 2d at 229.

      *b.  Beard's belief that Bruder's work performance deserved the given rating*

Bruder also argues that Beard's testimony is untrustworthy, but again he fails to provide any supporting evidence.  For example, Bruder questions the validity of Beard's statement that,

when Bruder gave her his case assignment sheet, she was able to quickly close four of his FOIA cases.  See 1st Beard Decl. at 20.  Bruder tries to create an issue of fact by posing a variety of questions that he should have asked during discovery, such as "[w]hich cases were these?"  Pl.'s Opp'n at 28.  But his failure to inquire during discovery—or at any other time during the years this case has been pending—about the specifics of a witness's statement does not create a genuine issue of material fact.  Moreover, Bruder does not deny Beard's statement.  Instead, he claims that "[e]ven if [DOE] could establish that [Beard] did in fact close four such cases, that would not demonstrate or intimate that [Bruder] had not dealt with these cases properly."  Id. at 29.  Again, though, the issue here is not whether Bruder actually performed well; it is whether his supervisors honestly believed that his work performance merited the given rating.  See Kelly, 677 F. Supp. 2d at 229 (explaining that the court determines only whether the defendant "honestly believed" that plaintiff's work deserved the given rating and "acted in good faith upon those beliefs").  Here, Bruder does not deny that he gave Beard a copy of his case assignment sheet, that Beard identified open cases on his sheet, or that Beard easily closed four of those cases.  Hence, there is no genuine dispute of material fact about Beard's statement and her reason to believe that Bruder's work performance was less than outstanding.

Bruder also contends that Beard's statement that he missed the main legal issue of a FOIA matter is "likely untruthful and therefore pretextual" because Beard "did not identify the FOIA matter or the allegedly missed issue."  Pl.'s Stmt. at 13.  The particular FOIA matter and the specific missed issue, however, are subjects about which Bruder could have inquired during the years this case has been pending.  His failure to do so, and his resultant failure to proffer anything other than his unsupported allegation that Beard's statement is "likely untruthful and therefore pretextual," falls far short of meeting his obligation to produce evidence of Beard's

purported untruthfulness. And Bruder's mere speculation that Beard must be lying because her statement is not as specific as he would like it to be is not sufficient to show a genuine dispute of material fact. See Greene, 164 F.3d at 675 (explaining that, to defeat a motion for summary judgment, the plaintiff may not rely solely on allegations or conclusory statements).

Bruder also unsuccessfully attempts to show inconsistencies in Beard's testimony. For example, he argues that it was inconsistent for Beard to "initially allege[]" that he "often missed meetings," but then to identify only one meeting that Bruder missed. Pl.'s Opp'n at 29-30. There is no inconsistency here. Beard stated that Bruder often missed meetings, and she supplied an example of one such meeting. See Attach. A to Pl.'s Opp'n [ECF No. 29-2], Deposition of Susan Beard ("Beard Dep.") at 199:20-201:19. Moreover, Bruder admits that he did not attend at least one meeting due to "confusion involving a computer calendar." Pl.'s Opp'n at 30. To the extent Beard could not recall other specific meetings that Bruder missed, such a minor gap in her recollection of events that occurred years earlier does not suggest untruthfulness or discriminatory animus. See Mulrain, 900 F. Supp. 2d at 73.

Similarly unavailing is Bruder's argument that Beard's testimony was inconsistent when she stated that Bruder sometimes "lost sight of the nature and scope of [a] project and was drawn into ancillary issues," but then identified only one such instance. Id. at 46-47 (citing Beard Dep. at 236-237). Again, there is no inconsistency. Beard stated that Bruder sometimes was drawn into ancillary issues, and then she identified one such instance. See Beard Dep. at 237:9-20. Bruder's own proffered opinion that he was not drawn into ancillary issues is not sufficient evidence that Beard was untruthful in her statement.

Bruder also baldly asserts that Beard failed to factor into his final annual rating the positive evaluation he received while on detail. But this assertion is flatly contradicted by record

evidence. The testimony shows that "Beard solicited the views of [Lot Cooke,] the person who supervised [Bruder] while he was on detail during approximately the last ten weeks of the 2006-2007 [evaluation] period, and then 'factored' that favorable assessment into increasing [Bruder's] final rating from a 3.0 to a 3.2." Def.'s Mot. at 19 (citing 3d Beard Decl. ¶ 9; 2d Beard Decl. ¶ 13; Ex. L to Def.'s Mot. [ECF No. 29-3], Mem. from Lot Cooke to Susan Beard at 1-2 (providing an evaluation of Bruder's work on detail)). Moreover, Beard stated in her deposition that, "[o]n [Bruder's] final rating," she took "into account the rating that [ALIL] received from [Cooke]." Beard Dep. at 228:20-229:2. Furthermore, Smith acknowledged that Beard raised the 3.0 rating that he suggested they give Bruder to a 3.2 because of the evaluation of Bruder's detail supervisor. Smith Decl. ¶ 13. Bruder has not submitted any evidence to the contrary.

Like his arguments disputing the truthfulness of Smith's testimony, then, Bruder's challenges to Beard's testimony do not show that she "made an error [in assessing Bruder's work] too obvious to be unintentional," Fischbach, 86 F.3d at 1183, or that she did not "honestly believe" that Bruder deserved the rating he received, Kelly, 677 F. Supp. 2d at 229. Ultimately, although Bruder may disagree with his supervisors' opinions of his work performance, he fails to demonstrate that either Smith or Beard did not honestly believe their stated reasons for giving him a 3.2 rating.

2. Bruder does not discredit his co-workers' testimony.

Bruder's less-than-outstanding work performance is also described in declarations from all of Bruder's former ALIL co-workers. In the first round of declarations submitted with DOE's first motion to dismiss or for summary judgment, however, the declarations largely concentrated on Bruder's behavior—such as refusing to update his list of assignments, refusing to take on additional assignments, and reading novels during work hours—over the four-day period of time

(Wednesday-Friday, July 11-13 and Monday, July 16, 2007) when Kumar and Trznadel were acting supervisors and when Bruder was preparing to leave for a four-day vacation. See Kumar Decl. ¶¶ 4-6 (describing how she acted as supervisor when Smith was out of the office; how, when she asked Bruder to update his list of active cases, he "handed his sheet back to me and told me that I needed to update it"; and how, during at least one meeting while Smith was out, "Mr. Bruder refused to take on an assignment that I was attempting to provide to him"); 1st Trznadel Decl. ¶¶ 3-5 (describing how she acted as supervisor when Smith was out of the office; how "Mr. Bruder refused to take [an assignment] from us" during that time; how, when she told him that everyone had to pitch in and do work, "[h]is response was to cross his arms and not look at us"; and how, "[w]hen I walked past his office, which was at least one to two times per day, his computer screen was black, or inactive, and there were no papers or packages out on his desk" and "on a few occasions . . . Mr. Bruder was reading novels or paperbacks during the workday, or had his feet up on the desk while shining his shoes"); Attach. to Ex. K to Def.'s Mot. [ECF No. 29-2], June 24, 2009 Decl. of Jocelyn Richards ("1st Richards Decl.") ¶¶ 3-6 (describing how Bruder refused to accept new work assignments when Smith was out and how "[h]is desk was frequently completely bare—no files, notes, or documents" and "[o]ccasionally . . . [he was seen] reading 'The Godfather' or polishing his shoes on his desk"); Attach. to Ex. G to Def.'s Mot. [ECF No. 29-2], July 1, 2009 Decl. of Katie Strangis ("1st Strangis Decl.") ¶¶ 3-7 (describing how Bruder refused to accept new work assignments when Smith was out and how "[m]ost, if not all, of the times I walked by his office I noticed there were no papers on his desk or in the area and his computer screen was off . . . [and] [o]nce I noticed him polishing his shoes on his desk"). Because the declarations concentrated on the four-day period when Smith was out of the office and before Bruder went on vacation and then on detail, the Court, construing the

facts before it in a light most favorable to Bruder, found in its last opinion that "it is possible that Bruder declined assignments because he only had four days before he left the ALIL group for the detail position" and "[i]t is possible that the other ALIL employees did not realize that Bruder was on detail when they saw that his computer was off or that there were no papers on his desk." July 17, 2013 Mem. Op. at 15.

DOE has now submitted a second round of declarations from Bruder's co-workers explaining that his behavior during the four-day period described in their first declarations was indicative of his behavior throughout the year.  See 2d Strangis Decl. ¶¶ 3-4 ("The behaviors I identified in my [first] [d]eclaration relating to Mr. Bruder were apparent almost from the very start of the time at which he was assigned to the group in which I worked, which would have been late 2006 or early 2007 . . . [and] my office was directly across from Mr. Bruder's office the entire period of time he worked for Mr. Smith, and it was during that entire time I observed that his computer was rarely turned on and his desk was completely empty of papers, pens, file folders, anything that one would expect to find on the desk of an actively practicing attorney."); 2d Trznadel Decl. ¶¶ 4-6 ("My [first] [d]eclaration . . . discussed Mr. Bruder's behaviors around the time Mr. Smith experienced a medical emergency in July 2007.  In doing so, however, I was not suggesting that Mr. Bruder's behaviors were limited only to that time period.  Rather, his actions in July 2007 reflected a continuation of his behaviors that were manifest from the beginning of 2007."); 2d Richards Decl. ¶¶ 3-4 ("While my [first] declaration did focus on the period when our supervisor, Mr. Isiah Smith[,] was on medical leave, I did not mean to limit my observations about Mr. Bruder's behaviors at work only to a short period of a few days . . . . [T]he observations I made . . . about Mr. Bruder's approach to work were true for the entire duration of the time that I worked with him, and were not exclusive to the period of time when

Mr. Smith was on medical leave . . . Mr. Bruder rarely had any files, notes or documents on his desk during the entire period he was assigned to my unit . . . it was apparent he was not working on very much.").

Bruder disputes some of the testimony from these two rounds of declarations. His contentions can be divided into three basic arguments: (1) he concedes that he refused to accept assignments from Trznadel and Kumar when Smith was on medical leave in July 2007, but argues that his refusal was appropriate because he knew he would be going on detail; (2) he argues that the second set of declarations are inconsistent with the first set; and (3) he argues that the declarations contain untruthful allegations about his work performance.

*a. DOE's evidence showing that Bruder did not know he would be placed on detail in advance of leaving for vacation*

After Smith went on medical leave on July 11, Trznadel and Kumar were appointed as acting supervisors in ALIL. When they attempted to give Bruder new assignments, he refused. Bruder admits that he refused to accept new assignments, but contends that it was appropriate for him to do so because he knew that, after his upcoming vacation, he would immediately be placed on detail. DOE, on the other hand, asserts that Bruder was not aware until after he returned from his vacation that he would be placed on detail and that, therefore, he "did not decline assignments because he was going to be moved to another office"; instead, "[h]e declined assignments because that was in keeping with the conduct he exhibited throughout his tenure in ALIL." Def.'s Mot. at 17. In support of its assertion, DOE has offered an affidavit from Beard stating that Bruder's detail assignment was not finalized until after Bruder had left for vacation, and she did not inform Bruder that he would be going on detail until after he returned from vacation. 3d Beard Decl. ¶ 8; 2d Beard Decl. ¶ 12. Beard also asserts that Bruder requested a permanent transfer to another office, not a detail, so Bruder had no reason to believe, prior to his

return from vacation, that he would be put on detail. Def.'s Mot. at 16. (citing 3d Beard Decl. ¶ 8). Hence, DOE argues, Bruder's explanation that he did not accept new assignments because he knew he was leaving to go on detail is merely a "post-hoc rationalization." Id. at 17.

DOE has also produced testimony from Bruder's former co-workers asserting that he did not mention that he was going on detail when he refused assignments; instead, his excuse was that he was too busy and was leaving for vacation. See 2d Richards Decl. ¶ 5 ("Mr. Bruder said he refused the new assignments because he was too busy and could not accept any new work, and cited the fact he was working on . . . FOIA and FTCA work . . . . He never indicated that his refusal was based on him being detailed to a new office."); 2d Trznadel Decl. ¶ 3 ("The only thing Mr. Bruder ever said in my presence in July 2007 about his status was that he was going on vacation. He did not say that he was transferring to another office after he completed his vacation."); 1st Kumar Decl. ¶ 6 ("Mr. Bruder did not advise me that he had requested a transfer to another office or that he intended to transfer to another office.").

In the face of this extensive evidence, Bruder continues to assert that, before he left for his vacation, he knew that he would be placed on detail. Pl.'s Opp'n at 62, 65-66. Without providing any supporting evidence, Bruder asserts that he had been told "a week or more earlier" by the Assistant General Counsel and the Deputy General Counsel "that his presence in the new office was vital and needed immediately, that both officials were eager to have him there, and that the detail was only a matter of formally moving and signing certain papers. Thus, even if the detail had not yet been 'finalized,' [Bruder] was rightly certain that it would be, and in acting accordingly." Id. at 66. But, again, Bruder has failed to provide any evidence to support his bare and self-serving assertions. He provides no affidavits to support that the Assistant General Counsel or the Deputy General Counsel told him they needed him immediately or that the detail

assignment was all-but-finalized. And there can be no genuine dispute of material fact when there is no evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. Bruder has not refuted DOE's evidence showing that he did not know he would be placed on detail in advance of leaving for vacation, and thus there is no genuine dispute that Bruder refused assignments from his acting supervisors for reasons his supervisors found unacceptable. 3d Beard Decl. ¶ 7 (stating that "it is never a valid excuse to refuse assignments because of vacation plans" and "it is very doubtful that [] Bruder was too busy with other work . . . to accept new assignments"); Smith Decl. ¶ 13 (stating that "[t]he reports I received about [Bruder's] work in my absence were negative . . . [h]e refused to take or perform assignments from th[e] two attorneys [serving as acting supervisors] and generally did not make any attempt to help with the additional work that arose in that period").

### b. Consistency of the declarations from Bruder's former co-workers

Bruder also asserts that the second round of declarations from his former co-workers submitted by DOE show "alter[ations] of its witnesses['] prior testimony" which, in some cases, "flatly contradict allegations made earlier in this proceeding." Pl.'s Opp'n at 22. Having reviewed the testimony, the Court finds no such inconsistencies.

Bruder contends that his former co-workers' second declarations, which state that his less-than-outstanding work performance occurred throughout the 2006-2007 evaluation period, are inconsistent with their first declarations, which he alleges state only that he "had refused to do work and/or done work badly during the entirety of [Monday, July 23, 2007 to Wednesday, October 31, 2007]," which was when he was on detail. Pl.'s Opp'n at 56. Bruder's contention is meritless. First, none of the first declarations refer to the July 23, 2007 to October 31, 2007 timeframe. Rather, they refer to the "summer of 2007." See 1st Trznadel Decl. ¶¶ 3-7; 1st

Strangis Decl. ¶¶ 3-6; 1st Richards Decl. ¶¶ 3-6. Second, although the first round of declarations concentrated on the summer of 2007, there was no indication that the declarants' observations were limited only to that time period. Third, the second round of declarations clarifies that the declarants did not intend to limit their observations to the summer of 2007. See 2d Trznadel Decl. ¶ 4 ("My [first] [d]eclaration . . . discussed Mr. Bruder's behaviors around the time Mr. Smith experienced a medical emergency in July 2007. In doing so, however, I was not suggesting that Mr. Bruder's behaviors were limited only to that time period."); 2d Strangis Decl. ¶ 3 ("The observations I made about Mr. Bruder's performance related both to the time at which Mr. Smith's medical problems first arose in early July 2007 and to the previous six months."); 2d Richards Decl. ¶ 3 ("While my [first] declaration did focus on the period when our supervisor, Mr. Isiah Smith[,] was on medical leave, I did not mean to limit my observations about Mr. Bruder's behaviors at work only to a short period of a few days."). These second declarations specifically state that the behaviors referenced in the first declarations also occurred before the summer of 2007. See 2d Trznadel Decl. ¶ 4 ("[Bruder's] actions in July 2007 reflected a continuation of his behaviors that were manifest from the beginning of 2007"); 2d Strangis Decl. ¶ 3 ("The behaviors I identified in my [first] [d]eclaration relating to Mr. Bruder were apparent almost from the very start of the time at which he was assigned to the group in which I worked, which would have been late 2006 or early 2007"); 2d Richards Decl. ¶ 4 ("[T]he observations I made in . . . my [first] [d]eclaration about Mr. Bruder's approach to work were true for the entire duration of the time that I worked with him, and were not exclusive to the period of time when Mr. Smith was on medical leave.").

Bruder fails to show that the declarations submitted by his former co-workers are inconsistent. To the contrary, each co-workers' second declaration is consistent with the first

declaration.  And both sets of declarations for each employee are generally consistent with those of every other employee.

> ### c.   *Former co-workers' testimony about Bruder's less-than-outstanding work performance*

Bruder also asserts that his former co-workers lied in their declarations when they made statements about their observations of his work performance, but he fails to support his assertion with any record evidence.  For example, Bruder attempts to discredit Trznadel's statement that Bruder "openly resisted guidance" on an assignment and "appeared . . . [to be] trying to generate a confrontation with Mr. Smith," 2d Trznadel Decl. ¶ 6, by citing a statement made by defense counsel during Smith's deposition.  Pl.'s Opp'n at 70 (asserting that defense counsel stated that "Mr. Smith never asserted that [Bruder] was insubordinate") (citing Smith Dep. at 162).  But defense counsel's unsworn statements made during a client's deposition are not evidence.  <u>See, e.g.</u>, <u>United States v. Johnson</u>, 527 F.2d 1381, 1385 (D.C. Cir. 1976).

Similarly lacking in support is Bruder's argument that Trznadel and Richards' testimony asserting that Bruder "held onto assignments for a long time" is a "bare allegation."  Pl.'s Opp'n at 27-28; <u>see also</u> Attach. H to Pl.'s Opp'n [ECF No. 31-2], Deposition of Reesha Trznadel at 74:14-75:14 (stating that Bruder did not indicate that he had progressed on a case over the course of two monthly meetings); 2d Richards Decl. ¶ 4 ("During the time [Bruder] was assigned to my unit, there were general staff meetings in which line attorneys would report on the cases they were handling.  Based on the statements [Bruder] made at those meetings, it was apparent he was not working on very much, and what he was working on never appeared to move forward to any resolution.").  But Bruder does not actually deny this allegation; he just declares that it is "a matter of material fact for a jury."  Pl.'s Opp'n at 28.  Bruder's disagreement with his former co-workers' impressions, however, is not sufficient to create a genuine dispute of material fact.

Bruder also takes issue with Strangis' statement that Bruder missed a mandatory meeting "sometime around February of 2007," 2d Strangis Decl. ¶ 5. He admits missing the meeting, but he vigorously argues that it was not important. Pl.'s Opp'n at 30-31 ("The Plaintiff did in fact not attend the subject meeting . . . . [He] was full versed in the necessary legal work which the project entailed, so that neither he nor the office were in any way scanted or inconvenienced by his absence."). The heart of the matter, however, is that Bruder missed a required meeting. His personal opinion of the importance of the meeting does not show untruthfulness on the part of Strangis or a genuine dispute of material fact.

Ultimately, the testimony from Bruder's former co-workers supports the impression of his supervisors that his work was less than outstanding, and Bruder provides no evidence on which a reasonable jury could find that his former co-workers have been untruthful.

**B.  Bruder Does Not Provide Evidence Sufficient To Show That Discrimination Was The True Motivation Behind His Annual Rating.**

A plaintiff can survive summary judgment by producing evidence suggesting that, despite defendant's non-discriminatory explanation, discrimination was more likely than not the motivating factor in the challenged decision. See Burdine, 450 U.S. at 256. Here, Bruder makes several arguments purporting to support his view that DOE was motivated by discriminatory intent. None are successful.

Most of Bruder's arguments are merely recitations of claims that this Court has already dismissed for failure to exhaust administrative remedies or for failure to show an adverse employment action, such as Bruder's allegations that he did not receive particular assignments, that he was never appointed as acting supervisor, and that his administrative grievances were not properly handled. Pl.'s Opp'n at 10-15. These allegations have no connection to Bruder's annual rating or to his supervisors' decision that Bruder's work performance merited the given rating. If

anything, Bruder's supervisors' reluctance to give him certain assignments or appoint him acting supervisor are indications that they had deep concerns about his work performance. Regardless, these allegations do not provide any support for Bruder's argument that his 2006-2007 rating was the result of discrimination.

Bruder also points to deposition testimony from David Krentel, a male DOE employee who had worked under Beard and who asserts that Beard discriminates against "straight white men." Attach. C to Pl.'s Opp'n [ECF No. 31-2], Deposition of David Krentel at 23:13-24:7, 25:22-26:1. Specifically, Krentel testified that Beard did not treat him and several other straight, white men as well as she treated "women . . . , blacks, [and] gay[s]." Id. Krentel's testimony that he believes Beard discriminates against straight, white men "constitutes conclusory speculation devoid of any factual foundation or connection to the performance review of plaintiff[.]" Robinson v. Duncan, 775 F. Supp. 2d 143, 154 (D.D.C. 2011) (disregarding plaintiff's "repeated citation[s] to others who opine that [plaintiff's supervisor] is a racist" when determining whether plaintiff had shown a plausible inference of discriminatory animus). Testimony like Krentel's, which "contain[s] nothing more than unsubstantiated rumors, conclusory allegations, and subjective beliefs[,] [is] wholly insufficient to establish an inference of discrimination." Glass v. Lahood, 786 F. Supp. 2d 189, 218 (D.D.C. 2011) (disregarding plaintiff's proffered declaration by a former fellow employee who opined that plaintiff's supervisor harbored racial animus). "When a plaintiff's own subjective belief that []he has been subjected to unlawful discrimination will not suffice, a third-party's unadorned speculation will fare no better." Id. Accordingly, Krentel's testimony that he believed Beard generally harbored animus against straight, white men is not competent evidence to show that Beard was motivated by discrimination based on Bruder's age or gender when she issued him an annual rating of 3.2.

In summary, DOE has articulated a legitimate, non-discriminatory reason for its decision not to give Bruder a rating higher than a 3.2 for the 2006-2007 evaluation period, and Bruder has not shown that DOE's explanation is mere pretext by "produc[ing] evidence sufficient for a reasonable jury to find that the employer's stated reason was not the actual reason and that the employer intentionally discriminated" against him because of his age or gender. Brady, 520 F.3d at 495. Bruder may sincerely believe that DOE gave him a lower annual rating because of his age and gender, but his mere "belief coupled with unsupported speculation or allegations of discrimination . . . cannot defeat [DOE's] adequately supported []motion for summary judgment." Peterson, 925 F. Supp. 2d at 89 (internal quotation marks and citation omitted). Accordingly, because Bruder fails to introduce admissible evidence showing a genuine issue of material fact that DOE's stated explanation is false and that a discriminatory reason motivated its actions, summary judgment will be entered in DOE's favor.

## CONCLUSION

For the reasons set forth above, the Court will grant summary judgment for DOE. A separate Order has been issued on this date.

_____
/s/
JOHN D. BATES
United States District Judge

Dated: July 2, 2014